UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

AMEERAH SMITH,

                           Plaintiff,

         v.

**MEMORANDUM & ORDER**
18-CV-6626 (MKB)

COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiff Ameerah Smith, proceeding *pro se*, commenced the above-captioned action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "SSA"). (Compl., Docket Entry No. 1.) The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the Administrative Law Judge (the "ALJ"), Hope G. Grunberg's ("ALJ Grunberg"), decision is supported by substantial evidence and should be affirmed because the ALJ appropriately determined Plaintiff's residual functional capacity ("RFC") and the evidence submitted to the Appeals Council did not show a reasonable probability of changing the outcome of ALJ Grunberg's decision. (Comm'r Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 12; Comm'r Mem. in Supp. of Comm'r Mot. ("Comm'r Mem.") 30–43, Docket Entry No. 13.) Plaintiff has not opposed the motion.

For the reasons discussed below, the Court denies the Commissioner's motion for

judgment on the pleadings and remands the case for further administrative proceedings.

## I.   Background

Plaintiff was born in 1981.  (Certified Admin. R. ("R.") 488, Docket Entry No. 8.)  On November 6, 2014, Plaintiff filed applications for DIB and SSI, claiming an onset of disability on November 1, 2008.  (R. 488.)  On October 7, 2015, the Social Security Administration denied Plaintiff's application.  (R. 362, 366–69.)  Plaintiff requested a hearing with an ALJ, (R. 370–71), which occurred on July 31, 2017 ("July 2017 Hearing"), before ALJ Lawrence Levey ("ALJ Levey"), (R. 272–315).  Following the hearing, Plaintiff submitted over one thousand additional pages of medical records, (R. 196), and requested a supplemental hearing, (R. 265), which was held in front of ALJ Grunberg on December 13, 2017 (the "December 2017 Hearing"), (R. 263–71).  Plaintiff was not present at the hearing but was represented by Valerie Blackman,[1] a paralegal from Queens Legal Services.  (R. 630, 636.)

By decision dated April 19, 2018, ALJ Grunberg found that Plaintiff was not disabled as defined by sections 216(i), 223(d), and 1614(a)(3)(A) of the SSA.  (R. 193–212.)  On June 18, 2018, Plaintiff requested review of ALJ Grunberg's decision by the Appeals Council, (R. 482–87), and submitted additional evidence, (R. 10–11, 14–192, 221–62).  By letter dated October 19, 2018, the Appeals Council denied Plaintiff's request for review, making the Commissioner's decision final.  (R. 1.)  Plaintiff filed a timely appeal with the Court.  (Compl.)

### a.   Hearing before ALJ Levey on July 31, 2017

Plaintiff appeared via videoconference at the July 2017 Hearing before ALJ Levey and was represented by Blackman.  (R. 274, 638.)  During the hearing, ALJ Levey heard testimony

---

[1]  The transcript of the hearing incorrectly names Plaintiff's representative as "Brachman."  (R. 265.)

2

from Plaintiff and a vocational expert, Pamela Tucker.  (R. 274–315.)

### i.   Plaintiff's testimony

On July 31, 2017, Plaintiff lived at her friend's home in Hollis, New York.  (R. 278–80.)
The house was a one-family dwelling that did not require her to climb stairs.  (R. 279–80.)
Plaintiff was separated from her husband, and Plaintiff's children, ten-year-old twins and a four-
year-old, resided with their godmother.  (R. 280.)  Plaintiff studied for various professions over
the years and attended several schools, including "Humanities and Arts Magnet High School";
trade school, where she received a certificate in "[d]ental assisting"; and community college,
where she attained an associate's degree in business administration.  (R. 281.)  Plaintiff
subsequently enrolled in "Georgia Medical" trade school to become a pharmacy technician, in
Franklin Career Institute to pursue medical assisting, and in Chattahoochee Technical College to
study "medical assisting and . . . registered nursing."  (R. 281–82.)  Plaintiff has yet to complete
her registered nursing degree.  (R. 282.)

Given Plaintiff's certifications, she has been "able to find a job involving [her] training[s]
. . . pretty much all [throughout] [her] adulthood."  (R. 282.)  Plaintiff's last job was as a medical
assistant at Linden Medical in Brooklyn, New York, between May of 2015 and August of 2015.
(R. 282–83.)  Her duties at Linden Medical included having to "attend to . . . patient[s] in a
timely manner, make sure that they were dressed and complete for the day, administer
medication with [an] overseer watching[,] . . . clean[] up . . . patient[s,] . . . ma[ke] sure that they
ate[,] . . . tend[] to them throughout the day for any needs[,] . . . and ma[ke] sure that their area
was . . . clean and up to standards."  (R. 283.)  Plaintiff was also required to lift patients and
"change their clothing [and] . . . diapers."  (R. 283–84.)

Plaintiff suffered a stroke in August of 2015 that affected the right side of her body and

her nerves and led her to stop her job as a medical assistant. (R. 283–84, 289, 302.) Plaintiff asserts that her stroke, (R. 303), and resulting health problems — including atrial fibrillation ("AFib"), spinal stenosis, degenerative disc disease, peripheral neuropathy, posttraumatic stress disorder ("PTSD"), anxiety, hypertension, epileptic episodes and disorder, insomnia, headaches, depression, bipolar disorder, and pain in her knees, back, and "right side" — interfere with her physical ability to perform the job as a medical assistant, (R. 284–85).

Plaintiff's primary care doctor is Hillside Medical's Dr. Rohr, who has been treating Plaintiff's physical ailments for a year. (R. 285–86.) Plaintiff also receives treatment at Long Island Jewish ("LIJ") for psychological issues, as she has for the past three years. (R. 285–86.) In addition, Plaintiff has been receiving services from a physical and occupational therapist at her home twice a week for almost three years. (R. 286.)

Since 2015, a home health aide has been coming to Plaintiff's home seven days a week and a visiting nurse has been visiting Plaintiff's home once a week to check her vitals and monitor her medication. (R. 286–87.) Plaintiff's home health aide cooks, cleans, does laundry and grocery shopping, goes with her to all of her medical and nonmedical appointments, helps her bathe and get dressed, and is with her seven hours a day. (R. 288, 295.) She uses Access-a-Ride and Medicaid transportation ambulate services. (R. 288.)

Plaintiff has trouble sitting for a long time, and stood up during her testimony three times. (R. 286–87, 305, 311.) Plaintiff has back and knee pain, which began in or about 2005 and requires Plaintiff to stand for a maximum of ten minutes and sit for a maximum of about fifteen to twenty minutes at a time. (R. 290–91.) Several car accidents, pregnancies, and significant weight loss have all affected Plaintiff's back. (R. 290.) Plaintiff avoids climbing stairs and can barely walk a block before needing rest. (R. 291.)

Plaintiff has been twice hospitalized for seizures which she treats with one thousand milligrams of Keppra, taken twice daily. (R. 292.) Plaintiff had a seizure while "behind the wheel of a car" with her children in the car. (R. 305.) Plaintiff has had headaches for fifteen years and has been "in and out of the hospital" and taking Fioricet to deal with them. (R. 293.)

Plaintiff has been prescribed a cane and a walker for three years and uses them intermittently. (R. 293–94.) She has difficulty "lifting a five-pound bag of sugar," gripping objects, and bending, squatting, kneeling, and reaching overhead. (R. 294.) Plaintiff takes baths, naps, and uses heating pads to deal with the pain but avoids using pain medication because she has "had a prior problem with pain medication." (R. 295.)

Plaintiff sees a psychiatrist once a month and a therapist twice a month and is prescribed Fluoxetine, Paroxetine, Ativan, Lamotrigine, and another unidentified medication. (R. 296–97.) Plaintiff has been hospitalized multiple times for attempted suicide. (R. 296.) Plaintiff's medication for insomnia does not work, she has trouble sleeping, she sometimes has poor appetite, she has mood swings and crying spells every day, and she hears voices once a month telling her to harm herself. (R. 297–99.) Plaintiff has difficulty breathing and has shortness of breath, which triggers her anxiety and results in her becoming "like an emotional wreck" when she is trying to deal with breathing; this happens "[p]eriodically throughout the day, each day." (R. 295.) Plaintiff remembers to take her medication every day. (R. 299.)

ALJ Levey noted that Plaintiff's statements at the hearing differed significantly from the scarce records submitted to him and thus asked Blackman to submit supporting documents. (R. 300–01.) ALJ Levey questioned Plaintiff about a functional report she filed in December of 2014 indicating that she had no problems sitting, standing, or using her hands and that she went bowling and to the movies. (R. 302–03.) ALJ Levey questioned whether most of Plaintiff's

difficulty came after that and Plaintiff responded that the physical challenges started after but the mental problems started before she completed the functional report.  (R. 302.)

In responding to a question about her typical day, Plaintiff stated that the night before, her friend whom she lives with helps her get her "clothes together" and the next day, "[her] home health aide comes to help [her] get [her]self together dress-wise," gives her breakfast and prepares dinner, goes with her to therapy, and sometimes drops her off at her children's school or church.  (R. 303–04.)

### ii.   Pamela Tucker, Vocational Expert

A vocational expert, Pamela Tucker, (the "VE"), testified at the hearing after reviewing selected exhibits from Plaintiff's file.  (R. 306.)  The VE classified Plaintiff's past work as a data entry clerk as sedentary, semiskilled, with a specific vocational preparation ("SVP") of four.  (R. 307.)  The VE also classified Plaintiff's work as a "document prepar[er]" as sedentary, unskilled, with an SVP of two, and her work as an inventory clerk as sedentary, semiskilled, with an SVP of four.  (R. 307.)

ALJ Levey asked the VE whether a hypothetical individual ("Hypothetical Individual 1") with "the same age, education level[,] and work experience" as Plaintiff who is:

> limited to [a] light exertional level, can only occasionally climb ramps or stairs, balance and stoop[,] and is precluded from climbing ladders, ropes[,] or scaffolds, and from kneeling, crouching[,] and crawling, can utilize her dominant, right upper extremity for gross manipulation on a frequent but not constant basis, is precluded from exposure to excessive noise louder than or excessive light brighter than that found in a typical office environment, is additionally precluded from work-related exposure to unprotected heights and hazardous machinery, requires a low[-]stress working environment defined as being limited to the performance of simple, routine[,] and repetitive tasks, in a work environment free of fast-paced production requirements, one that involves only simple, work-related decisions with few, if any, changes in the workplace and no more than occasional required interpersonal interactions with members of the

> general public, coworkers and supervisors . . . could . . . perform any
> of [Plaintiff's] past jobs . . . previously described.

(R. 308–09.)  The VE responded that the individual would be capable of performing the work as a document preparer, mail clerk, label coder, inspector, and hand-packager.  (R. 309–10.)

ALJ Levey then asked the VE whether Hypothetical Individual 1, with the following changes and/or additions, could perform the document preparer job: instead of light exertion, the hypothetical individual has a "sedentary exertional level in terms of the ability to sit, stand, and walk" and "can only occasionally utilize her dominant, right upper extremity for pushing or pulling and can only occasionally utilize her lower extremities for pushing, pulling[,] and operation of foot controls" ("Hypothetical Individual 2"), and the VE affirmed.  (R. 310.)  The VE responded that Hypothetical Individual 2 could also perform the jobs of a circuit board assembler, address clerk, and a circuit board inspector.  (R. 310–11.)  The VE also stated that Hypothetical Individual 2 could do those jobs if she only had to stand for approximately two to five minutes every half hour.  (R. 312.)  The VE responded that a cane would allow Hypothetical Individual 2 to perform those jobs but a walker would preclude her from performing those jobs. (R. 312.)  ALJ Levey asked the degree to which an employer would tolerate such an employee being off-task in an unskilled, competitive employment, and the VE responded that an employee typically cannot be off-task more than fourteen percent of the workday.  (R. 312.)  ALJ Levey asked the degree to which an employer would tolerate impairment-related absence in an unskilled, full-time, competitive employment, and the VE responded that the employee "generally cannot miss more than one day per month[,] on average."  (R. 312–13.)  Regarding all of the jobs available to either Hypothetical Individual 1 or 2, the range of nationally available positions ranged from 19,000 to 35,000, according to the VE.  (R. 309–11.)

### b.  Hearing before ALJ Grunberg

At the December 2017 Hearing before ALJ Grunberg, (R. 263–71), Plaintiff's representative, Blackman, informed ALJ Grunberg that Plaintiff could not attend the hearing because she had been admitted to Rego Park Nursing Home indefinitely, as she "suffered from uncontrollable seizures, along with other health issues that have escalated." (R. 266.) ALJ Grunberg stated that she believed she could make a decision based on the existing record and the additional records that she had received without the need to call an additional vocational expert; Blackman had no objection. (R. 268.) ALJ Grunberg agreed to hold the record open for two weeks to receive the medical records from the nursing home. (R. 268–70.) Plaintiff was unable to obtain those records and requested that ALJ Grunberg issue a decision based on the existing evidence. (R. 196.)

### c.  Medical evidence

#### i.  Winthrop Hospital

In November of 2008, Plaintiff was diagnosed with AFib while being treated at Winthrop Hospital. (R. 1046–69.) A computed tomography scan ("CT scan") of her head and chest X-rays were normal. (R. 1054–56.) Plaintiff denied any drug use, (R. 1046), and was prescribed Coumadin, (R. 1047), Colace, Fioricet, aspirin, and Toprol-XL, (R. 1049).

Over eight years later, on July 12, 2017, Plaintiff was admitted to the Emergency Room ("ER") and was discharged on July 19, 2017. (R. 2239, 2805.) Plaintiff told hospital officials that she had a seizure the day before being admitted and five seizures on her admission day, (R. 2537), and was "crying because she was in so much pain." (R. 2405.) During her hospitalization, Plaintiff's electroencephalogram ("EEG") "showed no seizures" and a doctor noted that any "[b]reakthrough seizure [was] most likely secondary to noncompliance." (R.

2537).  Although Plaintiff "complain[ed] of diffuse body pain, specifying joints and muscles of [her] entire body[,] [there were] no inflammatory features on exam, and when distracted [there were] no focal findings of pain-tenderness," (R. 2532), and Plaintiff's physical exam indicated a full range of motion, (R. 2532).  The clinician noted that Plaintiff's "only complaints are pain and her wishes to receive further pain medication."  (R. 2532.)  On July 18, 2017, Plaintiff's pelvic exam was "unremarkable."  (R. 2674.)

### ii.  Wycoff Heights Medical Center

On April 25, 2009, Plaintiff was admitted to Wyckoff Heights Medical Center in Brooklyn, New York ("Wyckoff") for complaints of chest and back pain, (R. 945), and was hospitalized for a total of six days.  (R. 938.)  At the time she was admitted, Plaintiff was taking Tigan, Albuterol, Percocet, Coumadin, Norvasc, Ferrous Sulfate, Gabapentin, Flexeril, and Protonix.  (R. 942–43.)  She was prescribed morphine.  (R. 946.)  A clinician noted that Plaintiff said that the "Percocet does not help" and asked for more.[2]  (R. 972.)  Plaintiff also complained of dizziness and reported that she had fallen but caught herself on the bed, (R. 972–73), but her physical exam was "unremarkable," (R. 938).

On May 12, 2009, Plaintiff was re-admitted to Wyckoff based on complaints of chest pain and weakness.  (R. 1076.)  The first clinical impressions were "[Upper Respiratory Infection,] . . . chest pain, [and] early pregnancy," and the reason for admission was noted as substance abuse.  (R. 1085.)  Plaintiff was prescribed Tylenol and discharged the next day.  (R. 1085.)

On February 6, 2010, Plaintiff was again admitted to Wyckoff for complaints of a

---

[2]  On April 28, 2009, an unknown person wrote "[a]ddiction to pain med[ication]?" on Plaintiff's records at Wykoff.  (R. 973.)

headache.  (R. 815.)  Plaintiff told hospital officials that she was experiencing headaches twice a

day and not responding to Percocet.  (R. 817.)  It was noted that Plaintiff had a "steady gait," (R.

881), but "needs assistance," (R. 827).  Plaintiff received morphine.  (R. 854.)  On February 7,

2010, Plaintiff "walked out" of the hospital and the hospital notified security.  (R. 882.)

### iii.  Long Island Jewish Medical Center

On December 19, 2009, Plaintiff was evaluated at the ER at LIJ for neck, back, elbow

and left knee pain from a fall in the bathtub.  (R. 659, 665.)  A CT scan of Plaintiff's abdomen

and pelvis were performed with normal results except for a "tiny calcified granuloma . . . noted

in the right lung base."  (R. 669.)  A drug screen test was positive for benzodiazepines.  (R. 674.)

On January 4, 2010, Plaintiff returned to the ER at LIJ complaining of depression, upper

back pain, abdominal pain, and diarrhea.  (R. 678–79.)  Plaintiff was given Tylenol and

morphine.  (R. 681.)  An "impression" of colitis was noted.  (R. 683.)  It was also noted that

Plaintiff was "supposed to be on Coumadin; will restart [A]nticoag[,] . . . [and that her] [A]fib

[was] very low over [a] short period."  (R. 684.)  Plaintiff was given a psychiatric evaluation, and

she reported feeling very depressed, suicidal, and anxious.  (R. 689.)  Plaintiff had no "overt

delusions," was linear and goal directed, had fair insight and judgment, and had intact impulse

control.  (R. 689.)  The clinician noted that she was at risk for suicide.  (R. 689.)

Over five years later, on June 23, 2015, Plaintiff presented at LIJ for complaints of a

headache.  (R. 2217.)  A CT scan of her head was performed, and the results were normal with

"no evidence of acute hemorrhage or acute territorial infarct."  (R. 2217.)

In August of 2015, Plaintiff repeatedly went to LIJ for various complaints.  (R. 1466–90,

1521–63.)  On August 17, Plaintiff complained of a headache, and a physical exam revealed that

she had normal range of motion, was alert to time and place, had a normal cardiac rate, and was

not in apparent distress.  (R. 1552.)  Plaintiff was given "doses of [Z]ofran with morphine and

[B]enadryl for pain."  (R. 1552.)  On August 24, Plaintiff complained of dizziness and shortness

of breath, (R. 1535), and a physical exam showed a "regular [cardiovascular] rate and rhythm, no

rub[,] [and] no murmur[,]" and moderate respiratory distress, (R. 1538).  On that date, a blood

test was positive for opiates, amphetamines, and benzodiazepines.  (R. 1481.)  On August 25, a

brain magnetic resonance imaging ("MRI") showed that Plaintiff had "scattered small white

matter lesions nonspecific in distribution and appearance" and no other abnormality.  (R. 1476,

1535.)  A treating physician noted that the "white matter attenuation [is] consistent with

migraines."  (R. 1530.)  On August 26, Plaintiff complained of heart palpitations and shortness

of breath.  (R. 1521–22.)  A treating physician noted that the "palpitations/tachycardia[] [were]

more likely anxiety related."  (R. 1524.)

Similarly, in September of 2015, Plaintiff presented at LIJ with several complaints.  On

September 2, Plaintiff complained of "sensory loss," (R. 1820), and a brain CT scan revealed

negative results, (R. 1558).  On September 16, Plaintiff was admitted to LIJ for complaints of

chest pain and pain on her right side, (R. 1504), and another brain CT scan was unremarkable,

(R. 1555).  The clinician noted that while the August 2015 MRI of Plaintiff's brain did show

evidence of "chronic white matter changes," (*see* R. 1530 ("[W]hite matter attenuation [is]

consistent with migraines")), there was no evidence of a cerebrovascular accident.  (R. 1507.)

Plaintiff's physical exam was normal except Plaintiff had "diminished strength" on her right

side.  (R. 1516.)  Plaintiff returned to LIJ on September 28 for complaints of palpitations, was

instructed to "continue Toprol and other medications as directed," and was discharged with a

diagnosis of paroxysmal AFib and bipolar I disorder.  (R. 1793.)  A notation on Plaintiff's chart

indicated that Plaintiff had never been diagnosed with stroke.  (R. 1793.)

From October 14 to October 16, 2015, Plaintiff was hospitalized at LIJ with complaints of dizziness.  (R. 1879.)  Plaintiff was diagnosed at the time of discharge with "dizziness of unknown cause," AFib, and malingering, and her chart indicated that she had been diagnosed with stroke.  (R. 1879–80.)  On October 27, 2015, Plaintiff returned to LIJ with complaints of chest pain and was told to "continue" taking Lyrica and oxycodone.  (R. 1839.)

From February 11 to February 17, 2016, Plaintiff was hospitalized at LIJ for body aches and fever, was diagnosed with pneumonia, bipolar I disorder, hypertension, AFib, thyroid nodule, and seizure, and was told to continue taking her medication.  (R. 2069–70.)  From March 6 to March 11, 2016, Plaintiff was hospitalized at LIJ for body aches, fever, diarrhea, back pain, abdominal pain, and a rash.  (R. 1925.)  She was diagnosed with a rash and neuropathy and was prescribed oxycodone and Robaxin.  (R. 1925.)  It was noted that some of Plaintiff's symptoms may have been "caused by a virus."  (R. 1925.)  On April 19, 2016, Plaintiff underwent an MRI at LIJ due to complaints of back pain.  (R. 1944, 1955.)  The next day, Plaintiff was informed that she would not receive a prescription for pain medication but was given pain medication and discharged to follow up with pain management.  (R. 2808.)  LIJ arranged an ambulette to transport Plaintiff home.  (R. 2808.)

On May 2, 2016, Plaintiff went to LIJ complaining of a headache, neck pain, chest pain, and left arm, thigh, and foot pain and numbness.  (R. 2811, 2840.)  On May 3, 2016, the results of a CT scan of Plaintiff's head and a sonogram of her left lower extremity were unremarkable, (R. 2820–22), and Plaintiff's sensation in her motor, gait, and weight bearing were all normal, (R. 2842).  Plaintiff requested and was given narcotic pain medication while in the hospital.  (R. 2817.)  She was discharged on May 11, 2016, (R. 1995), and a doctor recommended that she not be given a prescription for pain medication to take home, (R. 1997).  On June 22, 2016, Plaintiff

returned to LIJ with complaints of headache, back pain, and left knee pain.  (R. 2885.)  Plaintiff

had "[a]bnormal behavior [with an] inability to bear weight" as well as "slurred speech."  (R.

2859.)  Plaintiff requested narcotics and oxycodone, (R. 2890), and was denied a prescription for

pain medication, (R. 2890).  On July 12, 2016, Plaintiff returned to LIJ stating that she felt

"fatigued and achy all over," tired, and short of breath, and alluding to having pneumonia.  (R.

2945.)  Dr. Acerra noted that Plaintiff did not have a fever, (R. 2945), had full range of motion,

normal spine, no muscle or joint tenderness, a normal heart rate and rhythm, and a normal

electrocardiogram ("EKG"), (R. 2947).  He noted that Plaintiff "refused [T]ylenol stating she had

it before and it did not work . . . [and that] she wants something stronger."  (R. 2947.)

On August 10, 2016, Plaintiff returned to LIJ with complaints of abdominal pain.  (R.

2961.)  After a CT scan, Plaintiff was diagnosed with "intussusception," (R. 2962), which a

further CT scan indicated was "nearly resolved," (R. 2980).  On September 7, 2016, Plaintiff

retuned to LIJ with complaints of headache, bruising, and pain and swelling in her right calf.  (R.

3163.)  Plaintiff was "accompanied by a home health aid[e] because of her medical conditions,"

and she stated that she "normally uses a walker[] because she has a [history] of strokes."  (R.

3163.)  On December 26, 2016, Plaintiff presented at the LIJ with complaints of pain from a

fractured coccyx that had been surgically repaired two weeks earlier stating, "I feel like I re-

fractured it."  (R. 3213.)  A radiograph revealed "[n]o acute fractures or dislocations of the

sacrum or coccyx."  (R. 3184.)  Plaintiff also complained of pain in her thumb and right shoulder

from falling, and an examination of those areas also showed no acute fracture or dislocation.  (R.

3183, 3188–89.)  Plaintiff was discharged with pain medication.  (R. 3190–94.)

Five months later, on May 13, 2017, Plaintiff returned to LIJ with complaints of chest

pain at a level of ten on the pain scale of one to ten.  (R. 3271, 3273.)  Plaintiff stated that she

fainted at a friend's house while using the toilet.  (R. 3275.)  A CT scan of Plaintiff's brain on

May 14, 2017, showed "[n]o acute territorial infarct, hemorrhage, mass[,] or mass effect."  (R.

3248–49.)  A "Nurse Note" indicated that Plaintiff does not need assistance standing, walking,

getting in or out of a bed/chair, or using the toilet.  (R. 3276.)  Plaintiff reported that she lost her

cane but would replace it.  (R. 3283.)  Although it was "strongly recommended" that Plaintiff be

admitted to the hospital, (R. 3283), Plaintiff indicated that she was leaving because it was

Mother's Day but would return that evening, (R. 3277–78).  Plaintiff was given Percocet in the

hospital.  (R. 3283.)

### iv.   Kennestone Hospital

On February 18 and February 22, 2010, Plaintiff was hospitalized at Kennestone Hospital

("Kennestone") in Georgia for a drug overdose.  (R. 1282, 1297.)  Plaintiff requested a detox

from Percocet and Xanax.  (R. 1285.)  Plaintiff reportedly walked in her room and talked on the

telephone.  (R. 1290.)  A CT scan of Plaintiff's brain was unremarkable.  (R. 1304.)

Three years later, from April 5 through April 30, 2013, Plaintiff was hospitalized at

Kennestone for mildly elevated blood pressure, diarrhea, pain, lower-extremity swelling, and

chronic narcotic use while thirty-four weeks pregnant.  (R. 1248, 1252.)  The hospital record

indicated, "[Plaintiff] is very well known to our practice and had been seen multiple times in

triage and had multiple admissions for various vague complaints.  This complaint [is] essentially

no different."  (R. 1252.)  While at the hospital, it was discovered that Plaintiff was "crushing up

medicines from home and inject[ing] them through her [intravenous] tubing."  (R. 1252.)  A

search of Plaintiff's property yielded "multiple pill bottles with both nonnarcotics and narcotics,"

including some bottles marked with the name of another patient.  (R. 1252.)  Plaintiff was

evaluated and found to have been dehydrated from diarrhea, to have a pulmonary edema, and to

have her blood positive for benzodiazepines.  (R. 1252.)  She was given one Percocet every six

hours "for her chronic pain," (R. 1253), and kept at the hospital because it was determined that

she was a danger to herself and her unborn baby, (R. 1252).  Plaintiff had a cesarean operation

and was provided an increased dosage of Percocet due to her "reported difficulty with . . . pain

control."  (R. 1253.)

      Between September 5 and September 11, 2013, Plaintiff was hospitalized at Kennestone,

presenting with complaints of abdominal pain.  (R. 1228, 1237.)  Doctors performed a diagnostic

surgical procedure to determine if there were any issues arising from Plaintiff's prior gastric

bypass surgery and did not detect anything abnormal.  (R. 1237.)  On November 29, 2014,

Plaintiff returned to Kennestone complaining of headaches.  (R. 1340–41.)  Psychiatric, medical,

and CT scan examinations showed normal findings.  (R. 1343–44.)

      On December 5, 2014, Plaintiff returned with complaints of headaches and back pain due

to "helping a friend move," (R. 1353), and medical tests showed that other than the stated

complaints, her physical and psychological examinations were normal.  (R. 1355.)  Plaintiff

returned on December 15, 2014, complaining of a level-ten pain in her head after a fall.  (R.

1363.)  Again, psychiatric, medical, and CT scan examinations showed normal results, with "no

intracranial mass or hemorrhage."  (R. 1365–66.)

      In January of 2015, Plaintiff presented to Kennestone on four different occasions, (R.

1376–443), and on each occasion, Plaintiff's physical and psychological examinations were

normal, other than stated complaints of abdominal pain, back pain, headache, earache, and leg

pain, (R. 1376–443).  Plaintiff was given prescriptions for Phenergan and Percocet, (R. 1402),

and was "cautioned regarding driving or operating heavy machinery," (R. 1384).

### v.  Cobb Outpatient Services

On March 5, 2010, Plaintiff was admitted for a "Behavioral Health Assessment" at CD Cobb Outpatient Services in Georgia ("Cobb").  (R. 778–82.)  The clinician noted that Plaintiff "was hospitalized for [three] days for an intentional overdose used to manipulate admission for [an] opiate [and Percocet] addiction."  (R. 779.)  The clinician identified substance abuse as one of Plaintiff's risk-taking behaviors.  (R. 779.)  The clinician found Plaintiff to be "of average or above [average] intelligence" and to have a combination of behaviors causing "moderate problem[s]."  (R. 780.)  On that date, Plaintiff stated, "I'm very intelligent, I've always been a high achiever, I excel all the time. . . . I'm very computer literate, a very detailed worker, I enjoy reading and writing."  (R. 779–80.)  On March 8, 2010, Plaintiff underwent a psychiatric evaluation and was assigned a Global Assessment of Functioning ("GAF") score of fifty-one.  (R. 1617, 1692.)  The clinic closed Plaintiff's chart on June 6, 2012, because she did not seek follow-up care.  (R. 1613.)

As a result of being arrested for prescription fraud in April of 2011, Plaintiff was required to attend treatment, and on July 2, 2013, Plaintiff returned to Cobb.  (R. 1603.)  On that date, the clinician noted that Plaintiff reported that she "was taking Zoloft and Ativan during pregnancy and after . . . [but] stopped taking them [two] weeks [prior] because she didn't like the[] way they made her feel," and that other medications did not help her.  (R. 1603.)  Plaintiff noted that she "ha[d] a job doing inventory but ha[d] not started."  (R. 1603.)  On August 7, 2013, Plaintiff attended a treatment session where she reported "starting use of pain med[ication] at age [twenty-eight] and . . . using up to [forty] pills per day."  (R. 1653, 1657.)  A clinician noted that Plaintiff had no active suicidal ideation, (R. 1658), that she was "conflicted, withdrawn, alienated, or otherwise troubled in most significant relationships, but maintains control of any

impulsive or abusive behaviors," and that she had moderate co-morbidity, (R. 1659), with

"[s]ignificant psychiatric symptoms and signs . . . which are themselves somewhat debilitating

and which interact and have an adverse effect on the course and severity of any co-existing

substance use disorder," (R. 1660).

On November 7, 2014, Plaintiff attended another treatment session and was found to be

"stable on [a] present regimen of medications," to have no current suicidal ideations, and to have

"[n]o current symptoms," but when symptoms are present, Plaintiff "cr[ies], [is] antsy, [is] hyper,

[and has] severe mood swings, poor sleep, poor appetite, fatigue, [and] nausea from anxiety."

(R. 1593.)  On January 8, 2015, Plaintiff was assigned a GAF score of fifty-five, (R. 1698); on

March 5, 2015, she was assigned GAF scores between thirty-one and forty; and on March 8,

2015, she was assigned GAF scores between forty-one and fifty, (R. 1444–45).

### vi.  Northside Hospital

On March 13, 2013, Plaintiff went to Northside Hospital in Georgia for complaints of

neck and back pain following a car accident.  (R. 1089.)  Dr. Rymon Wilborn noted that Plaintiff

did not appear to be in acute distress, that she had a regular heart rate and rhythm, that she had

full range of motion and no sign of trauma or injury, and that there was some tenderness in

Plaintiff's neck and back but no abnormality other than her back deformity.  (R. 1089–90.)

### vii.  Dr. Steven Berger, Ph.D.

On December 30, 2010, Plaintiff was examined by Dr. Steven Berger Ph.D., a licensed

clinical psychologist in Georgia, who conducted a clinical interview and a mental status exam

and reviewed Plaintiff's records.  (R. 772–75.)  Dr. Berger noted that Plaintiff "has a scattered,

weak work history which she claims is primarily due to frequent interstate moving, her inability

to concentrate at work[,] and her various medical problems."  (R. 773.)  Plaintiff reported that

since age twelve, she had made fifty suicide attempts by various means, and Dr. Berger noted

that "available records do not corroborate [fifty] attempts.  Her last suicide attempt was in March

[of] 2010 — an overdose attempt."  (R. 773.)  Plaintiff stated that "the threat of losing her

children" helped her stop further suicide attempts.  (R. 773.)

Plaintiff reported being hospitalized eight times since 2009 and noted that she was not

currently on any medication or receiving any psychological treatment.  (R. 773.)  Plaintiff

indicated that she stopped treatment in September of 2010 because her last "psychiatrist did not

believe her homicidal thoughts about her boyfriend," and that she stopped taking her psychotic

medication in October of 2010 because she "could not find a Medicaid provider to prescribe

them" but that she is on the waitlist at a community mental health center.  (R. 773.)  Plaintiff

reported that her mood swings were "her biggest problem."  (R. 773.)  Plaintiff denied drug or

alcohol abuse and reported that she was taking "[m]etoprolol, Coumadin, Percocet, and [i]ron for

her medical problems."  (R. 774.)  Plaintiff reported that "she does almost everything around the

house;" takes care of her children, dogs, and the bills; goes to school; and feels overwhelmed.

(R. 774.)  Dr. Berger noted that "[s]he is able to structure and execute her daily routine."  (R.

774.)  Dr. Berger diagnosed her with bipolar disorder and stated that her overall condition was

chronic and would last longer than twelve months.  (R. 774.)  Dr. Berger further stated that

although Plaintiff "report[s] a history of difficulty in maintaining [focus]," she "has the ability to

understand, remember[,] and carry out simple instructions."  (R. 774.)  Finally, Dr. Berger noted

that Plaintiff did not have a reported history of problems with the public, coworkers, or

supervisors, and that "it is likely that she would be at moderate risk of decompensating under

stressful conditions."  (R. 774.)

### viii.  Dr. James S. Harvey, M.D.

Dr. James S. Harvey M.D., of Piedmont Physicians at Cumberland Ridge, Georgia

conducted a disability evaluation of Plaintiff on February 10, 2011.  (R. 784–87.)  Dr. Harvey

noted that he had been told that Plaintiff "goes in and out of [AFib]" but that her use of

antiarrhythmics and Coumadin were inconsistent and that she denied any chest pain or

palpitations.  (R. 784–85.)  He further noted that Plaintiff had no history of seizures or head

trauma, a moderate deformity of her left knee, and a "pelvic rim [that] was somewhat higher than

her right," but that Plaintiff's gait was otherwise normal and she had full range of motion.  (R.

786.)  Dr. Harvey opined that Plaintiff's primary problem appeared to be "bipolar disorder with

psychotic features which include[] self-harming type hallucinations" and noted that her

paroxysmal AFib had no current symptomology.  (R. 787.)  He stated that "[s]hould she be

awarded benefits, she does not appear capable of managing them herself."  (R. 787.)

### ix.  Piedmont Hospital

From January through June of 2013, Plaintiff went to the ER at Piedmont Hospital

("Piedmont") in Georgia on multiple dates for complaints of headache, neck pain, back pain,

generalized fatigue, and nausea.[3]  (R. 1100–221.)  On different occasions, Plaintiff was

prescribed Valium, (R. 1130–31, 1136), oxycodone, Zofran, (R. 1154–55), and other medication.

Her X-rays and scans yielded negative results.  (*See* R. 1105–06.)

On April 1, 2013, Plaintiff complained of lower back pain and headaches after a motor

vehicle accident.  (R. 1177.)  Plaintiff refused X-rays and "state[d] that she would like something

simply for pain."  (R. 1179.)  She was prescribed Vicodin.  (R. 1180.)  On June 17, 2013,

---

[3]  (R. 1130–31, 1136 (January 4, 2013); R. 1139 (January 20, 2013); R. 1141–42
(February 24, 2013); R. 1145 (March 2, 2013).)

Plaintiff went to the ER after another motor vehicle accident.  (R. 1111.)  Plaintiff's motor skills were intact, her gait was normal, and she had full range of motion.  (R. 1112–13.)

On May 13, 2013, Plaintiff was admitted to the ER at Piedmont for similar complaints. Dr. Roberts noted that "[t]he patient states her headache is [ten out of ten], however, she rests comfortable [sic] in the bed.  She is watching [television] and eating with good appetite."  (R. 1215.)  He wrote that her headache likely results "from chronic migraine, mild eclampsia," and "medication overuse."  (R. 1216.)  Plaintiff stated that she stopped taking Coumadin and Lovenox without any medical advice.  (R. 1214.)

### x.  Dr. Iqbal Teli, M.D.

Dr. Iqbal Teli, M.D., examined Plaintiff on September 8, 2015, for the Division of Disability Determination.  (R. 1492–95.)  Dr. Teli noted Plaintiff's general appearance: She had a normal gait, used no assistive device, was "[a]ble to rise from chair without difficulty," "[n]eeded no help changing for [the] exam," and needed no help getting on and off the exam table but "could not walk on heels and toes."  (R. 1492–93.)  Dr. Teli also noted that Plaintiff had no sensory deficit, slight edema of the leg, grip strength of three out of five, "[a]bility to zip, button, and tie," "moderate restrictions for squatting and bending," and a "mild restriction with the use of the right arm" and hand.  (R. 1494.)

### xi.  Dr. Melody Goldman, Ph.D.

Dr. Melody Goldman, Ph.D., conducted a psychiatric evaluation of Plaintiff on September 8, 2015, as a consultant.  (R. 1498–1502.)  Dr. Goldman gathered from Plaintiff that she had a history of hospitalizations for suicide and depression and that she was not currently, nor had she ever been, in outpatient psychiatric treatment.  (R. 1498.)  Dr. Goldman noted that Plaintiff reported no prior drug abuse.  (R. 1499.)  Plaintiff reported trouble sleeping, "panic

attacks three or four times a day," nightmares, crying spells, distractibility, difficulty multi-

tasking, and anxiety about dying but reported no hallucinations, paranoia, or suicidal thoughts.

(R. 1499.)

Dr. Goldman performed several exercises with Plaintiff and determined that her thought

process was coherent, her memory and attention were intact, her intellectual functioning was

average, and her insight and judgment were poor.  (R. 1500–01.)  Plaintiff stated that she

"dresses, bathes, and grooms herself," cooks and prepares food, cleans, does laundry, shops,

manages her money, drives and is able to take public transportation, goes to the movies with her

children, "does things for her children," watches television, "listens to the radio, and reads."  (R.

1501.)  Plaintiff further explained that she was "supposed to get a home health aide" to help her,

as "any difficulties [she has] in performing activities of daily living [are] due to physical issues."

(R. 1501.)

Dr. Goldman determined that Plaintiff "is moderately limited in following and

understanding simple directions and instructions, . . . maintaining a regular schedule, . . .

performing complex tasks independently, . . . making appropriate decisions, . . . relating

adequately with others, . . . [and] appropriately dealing with stress"; that she is mildly limited in

attention, concentration, learning new tasks, performing simple tasks independently; and that she

has difficulties "caused by fatigue and distractibility."  (R. 1501.)  Dr. Goldman diagnosed

Plaintiff with bipolar and panic disorders but ruled out PTSD and borderline personality disorder,

(R. 1502), and concluded that Plaintiff's psychiatric and stress-related problems did "not appear

to be significant enough to interfere with [her] ability to function on a daily basis," (R. 1501).

### xii.  L. Blackwell, Ph.D. and E. Greene

On October 6, 2015, Plaintiff's medical history was evaluated by psychological consultant Dr. L. Blackwell, Ph.D., and disability adjudicator E. Greene in order to make a disability determination.  (R. 316–59.)  Dr. Blackwell gave great weight to the opinions of Dr. Teli, Dr. Goldman, and Dr. Berger and found that Plaintiff was not disabled.  (R. 333.)  Greene concluded that Plaintiff does have exertional limitations and that Plaintiff can occasionally lift twenty pounds, frequently lift ten pounds, stand or sit for six hours a day, occasionally climb ramps, stairs, and ladders, and occasionally balance, stoop, kneel, crouch, or crawl but needs to mostly avoid machinery or heights.  (R. 352–54.)

### xiii.  Kevin Chu

On February 23, 2016, Kevin Chu, a healthcare professional,[4] hand-filled a six-page,[5] predominantly check-box form entitled "Mental Medical Source Statement."  (R. 1884–89.)  Chu indicated that he had seen Plaintiff every two weeks since October 30, 2015.  (R. 1884.)  Chu diagnosed Plaintiff with major depressive disorder, borderline personality disorder, degenerative disorder, AFib, and Sciatica.  (R. 1884.)  Although the form requested that the provider "[a]ttach relevant treatment notes and test results as appropriate," no test results or treatment notes were attached.  (R. 1884–89.)  Chu found that Plaintiff has a depressed mood, multiple panic attacks, difficulty concentrating, "intermittent passive suicidal" ideations, and that her prognosis was "fair–good."  (R. 1884.)  Chu also checked the boxes indicating that Plaintiff was "seriously limited" in the categories of maintaining attention for two-hour segments, "[p]erform[ing] at a

---

[4]  The Mental Medical Source Statement does not state Chu's professional classification but indicates that he provided treatment to Plaintiff.  (R. 1884–89.)

[5]  Portions of the Mental Medical Source Statement are illegible.

consistent pace without an unreasonable number and length of rest periods," "[d]eal[ing] with normal work stress," "[u]nderstand[ing] and remember[ing] detailed instructions," and "deal[ing] with stress of semiskilled and skilled work," and that Plaintiff was "limited but satisfactory" or "unlimited" in all other listed areas of functioning.  (R. 1886–87.)  He found that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation and anticipated that Plaintiff would need to take about four days off a month because of her impairments.  (R. 1888.)  According to Chu, Plaintiff's anxiety and mood issues exacerbate her pain symptoms, (R. 1887), but substance abuse did not contribute to any of her limitations, (R. 1889.)  Chu assigned Plaintiff a GAF score of fifty and noted that her highest GAF score in the past year was sixty.  (R. 1884.)

### xiv.  Evidence submitted to the Appeals Council

Plaintiff submitted additional information to the Appeals Council after the disability determination by ALJ Grunberg.  Plaintiff submitted a "FEDCAP"[6] "Biopsychosocial Summary" signed by Dr. Jean Louise Harris and dated November 30, 2017.  (R. 221–60.)  A note in the document attributable to "KMcKinleyRN" states: "Unable to Work[,] [Plaintiff] has multiple psychological as well as [cerebrovascular accident issues,] and a [b]rain mass on the right side of her brain as well as other medical issues" and that Plaintiff "suffers from ongoing limitations secondary to [a] [r]ecent [s]troke with residual hemiparesis[,] anemia, [hypertension], [n]europathy, [b]ipolar disorder, PTSD, anxiety, seizures[,] anemia[,] and varicose veins."  (R. 223.)  Plaintiff notes that she "travels with an aide at all times," (R. 226); needs assistance walking, climbing stairs, hearing, seeing, bathing, dressing, grooming, "toileting," preparing

---

[6]  FEDCAP is a nonprofit providing occupational health services, among other services. *See* FEDCAP, https://www.fedcap.org (last visited Dec. 5, 2020).

meals, shopping, and housekeeping, (R. 232–33); and "has a weak bladder [that causes her to] wears diapers," (R. 236).  A comment in the document states that Plaintiff "walks very slowly with a walker bent slightly forward," and that she has "[r]ight upper and right lower extremity weakness, especially noticeable in the right upper extremity and right hand."  (R. 250.)  During an eye exam, Plaintiff could not read the chart, and during a physical exam, Plaintiff refused an EKG, stating that "the nurse at [the] nursing home will do it."  (R. 237.)  Plaintiff was considered limited in all areas of functioning except sitting, communication, interpersonal relationships, and respiratory functioning.  (R. 251–54.)  Dr. Harris determined that Plaintiff "may potentially be eligible for disability benefits."  (R. 260.)

On November 29, 2017, Plaintiff was admitted to Rego Park Nursing Home with diagnoses of cerebral infarction, osteoarthritis, and hypertension.  (R. 262.)

In a July 25, 2018 letter from Dr. Joyce Tanzer-Levy of Zucker Hillside Hospital that was completed in support of a housing application, Dr. Tanzer-Levy indicated that Plaintiff had been "known to this hospital since [December 18, 2009]," had visited the psychiatric ER several times, was hospitalized twice, had been treated as a former and current patient at the Outpatient Clinic, was attending individual therapy every other week, and was being seen for medication management monthly.  (R. 11.)

Plaintiff also provided additional LIJ ER records from her visits in 2018.  (R. 14–191.) She was seen in the LIJ ER on February 28, (R. 190), May 7, (R. 48–54), June 21, (R. 15–19), June 25, (R. 36–42), July 7, (R. 154–71), and August 10, 2018 (R. 43–47).  She was also seen several times at Wyckoff.  (R. 128–33, 148–50.)  Her complaints on these occasions often involved pain, headaches, peripheral neuropathy, and palpitations; her tests were unremarkable, and she was usually given pain medication.  (R. 15–191.)

24

### d.   ALJ Grunberg's decision

ALJ Grunberg conducted the five-step sequential analysis as required by the SSA in making a disability determination.  (R. 197–99.)  First, ALJ Grunberg found that Plaintiff met "the insured status requirement of the [SSA] through September 30, 2013," and that she had "not engaged in substantial gainful activity since November 1, 2008."  (R. 199.)  Second, ALJ Grunberg found that Plaintiff had severe impairments of "lumbar degenerative disc disease[,] early degenerative joint disease of the left knee, paroxysmal [AFib,] hernia, headaches, peripheral neuropathy, seizures, obesity, mood disorder, depression, bipolar disorder, borderline personality disorder, anxiety, [PTSD], and polysubstance abuse/dependence."  (R. 199.)  ALJ Grunberg declined to find that Plaintiff's "history of gastric bypass surgery, hypertension, pregnancy, pulmonary edema, rash on hands, closed head injury and facial contusion, earache, pneumonia, and anastomosis intussusception" were severe impairments because either there were no significant ongoing limitations or they did not meet the duration requirements.  (R. 200.)  ALJ Grunberg also declined to find that any right-side weakness due to a stroke was a medically determinable impairment, as there was "no objective evidence" in the record that Plaintiff actually had a stroke, noting that all evidence came from statements made by Plaintiff.  (R. 201.)

Third, ALJ Grunberg determined that Plaintiff did not have an impairment or combination of impairments that met or were equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations.  (R. 201.)  Regarding Plaintiff's left knee impairment, ALJ Grunberg determined that although Plaintiff "has been noted to use a cane and a wheeled walker at times, examinations have shown normal motor strength" and the ability to walk independently.  (R. 201.)  Regarding Plaintiff's spine impairment, ALJ Grunberg determined that even though there was evidence of "foraminal stenosis," examinations have not

shown nerve root compression, limitation of motion of the spine, or motor, sensory, or reflex loss or other impairments.  (R. 201.)  In considering Plaintiff's AFib, ALJ Grunberg determined that "the record does not show uncontrolled, recurrent episodes of cardiac syncope or near syncope despite prescribed treatment."  (R. 201.)  ALJ Grunberg also considered evidence of headaches and seizures but determined that "despite noncompliance with seizure medications, the record does not document headaches or seizures with the frequency required by that listing."  (R. 201.)  In considering neuropathy, ALJ Grunberg determined that "the record does not show . . . extreme limitations" — whether physical or mental.  (R. 202.)  ALJ Grunberg also considered Plaintiff's obesity in "determining that no listing has been met or equaled."  (R. 201.)  ALJ Grunberg further determined that Plaintiff had moderate limitation in "understanding, remembering, or applying information," "concentrating, persisting, or maintaining pace," and "adapting and managing oneself," and mild limitation in "interacting with others."  (R. 202–03.)  In making these determinations, ALJ Grunberg considered Plaintiff's performance during "a consultative examination in September [of] 2015," records showing that Plaintiff's hospitalizations for mental health issues were mostly outside of the relevant period, observations that Plaintiff's mental health symptoms have "remained generally stable despite limited treatment," and observations and reports that Plaintiff was able to take care of herself, her household, and her children, use public transportation, and go out to the movies.[7]  (R. 202–03.)  Considering all of her impairments independently and in combination, ALJ Grunberg determined that Plaintiff had no extreme limitation in one area of functioning or marked limitation in two areas of functioning.

---

[7]  *See supra* Section I.c.xi (summarizing Dr. Goldman's September 9, 2015 report that Plaintiff explained that she "dresses, bathes, and grooms herself," cooks and prepares food, cleans, does laundry, shops, manages her money, drives and is able to take public transportation," goes to the movies with her children, "does things for her children," watches television, "listens to the radio, and reads."  (R. 1501.)).

(R. 203.)

ALJ Grunberg also determined that Plaintiff had the RFC to perform light work, with the specification that she:

> can occasionally climb ramps or stairs, balance, and stoop. She is precluded from climbing ladders, ropes, or scaffolds, and form kneeling, crouching, and crawling. She can utilize her dominant right upper extremity for gross manipulation on a frequent, but not constant, basis. She is precluded from exposure to excessive noise louder than or excessive light brighter than that found in a typical office environment. She is additionally precluded from work related exposure to unprotected heights and dangerous machinery. [Plaintiff] requires a low-stress working environment defined as being limited to the performance of simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and one that requires only simple, work-related decisions with few, if any, changes in the [workplace]. There should be no more than occasional required interpersonal interactions with the general public, [coworkers] and supervisors.

(R. 203.) In determining Plaintiff's RFC finding, ALJ Grunberg considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. 203.) ALJ Grunberg did not specify a date for the onset of the RFC.

In addition, ALJ Grunberg found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however[,] [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 205.) ALJ Grunberg found that Plaintiff's "allegations are not fully supported by the objective medical evidence or the longitudinal treatment history." (R. 205.) She determined that despite Plaintiff's numerous ER visits and hospitalizations, "the record . . . shows limited ongoing treatment[,] . . . [Plaintiff]

27

was often noted to be noncompliant with medication[, her] "imaging and examinations have typically shown few significant ongoing abnormalities," and her daily living has not been limited to the extent that would be expected by her complaints.  (R. 205.)  ALJ Grunberg listed evidence from examinations by Dr. Berger, Dr. Goldman, Dr. Harvey, Dr. Teli, and Dr. Blackwell, as well as evidence of opioid dependence, and noted observations and tests from various hospitalizations in support of her conclusion.  (R. 203–09.)

ALJ Grunberg gave significant weight to: (1) the "opinion of Dr. Teli, who opined that [Plaintiff] had moderate restrictions [in] squatting and bending as well as [a] mild restriction in using her right hand and arm," (2) the opinions of Dr. Berger and Dr. Goldman, because they were based on "detailed examinations," and (3) to the assessment of Dr. Blackwell, "who opined that[] despite her mental impairments, [Plaintiff] could perform simple work activity," as these opinions and assessments were "generally consistent with the record as a whole."  (R. 209.)  ALJ Grunberg gave partial weight to the report of Plaintiff's "treatment provider" Chu, who reported that Plaintiff had several serious limitations.[8]  (R. 209.)  ALJ Grunberg acknowledged that Chu's "statements were based on a treating relationship" but gave them only "partial weight because they [we]re not fully supported by the record."  (R. 209.)  In reaching this conclusion, ALJ Grunberg noted that Chu's "opinion was provided in February [of] 2016" but "the record shows few ongoing psychiatric complaints and limited mental health treatment since 2013."  (R. 209.)  ALJ Grunberg gave little weight to assessments of Plaintiff's GAF scores "ranging from [thirty-one] to [sixty]" as "the Commissioner has declined to endorse the GAF scale for 'use in Social

---

[8]  ALJ Grunberg noted that Chu's opinion was that Plaintiff "was seriously limited in maintaining attention for two-hour segments, performing at a consistent pace without an unreasonable number and length of rest periods, dealing with normal work stress, understanding and remembering detailed instructions, and dealing with stress of semiskilled and skilled work." (R. 209.)

Security and SSI disability programs' and has indicated [that] GAF scores have no 'direct correlation to the severity requirements [of the] mental disorders listings.'"[9]  (R. 209 (citing 65 Fed. Reg. 50,746, 50,764–65 (Aug. 21, 2000).)

At step four, "[a]fter considering the testimony [of the VE at the July 2017 Hearing] and comparing [Plaintiff's] [RFC] with the physical and mental demands of this work," ALJ Grunberg found "that [Plaintiff] is able to perform [as a document preparer] as it is generally performed" and that "there are other jobs existing in the national economy that she is also able to perform."  (R. 210.)  ALJ Grunberg found that the "work does not require the performance of work-related activities precluded by" Plaintiff's RFC.  (R. 210.)  At step five, ALJ Grunberg found that Plaintiff "has not been under a disability, as defined in the [SSA], from November 1, 2008, through the date of [ALJ Grunberg's] decision" on April 19, 2018.  (R. 211–12.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence

---

[9]  The Second Circuit has noted that "[t]he [SSA] has explained that '[u]nless [a] clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.'  Furthermore, '[u]nless the GAF rating is well supported and consistent with other evidence in the file, it is entitled to little weight under our rules.'" *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (third, fourth, and fifth alterations in original) (quoting U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (Oct. 14, 2014)).

as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court "can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'" *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 28 F.3d 1287, 1290 (8th Cir. 1994)).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *see also McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  The Commissioner's factual findings "'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside Commissioner's decision.  *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

**b.   ALJ Grunberg failed to properly consider the treating physician rule**

The Commissioner asserts that ALJ Grunberg properly gave Chu, Plaintiff's treatment provider's, opinion partial weight because it "was not supported by the psychiatric evidence in the record . . . and the limited mental health treatment Plaintiff had received."  (Comm'r Mem.

40–41.)

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative."[10] *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same).  However, an ALJ "must follow" specific procedures "in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019); *see also Ferraro v. Saul*, 806 F. App'x 13, 14 (2d Cir. 2020) (holding that "[u]nder Second Circuit precedent and the applicable regulations," the ALJ must follow the two-step procedure laid out in *Estrella* to determine the appropriate weight to assign to the opinion of a treating physician).  "First, the ALJ must decide whether the opinion is entitled to controlling weight." *Id.*  "The opinion of a claimant's treating physician as to the nature and severity of an impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" *Id.* (alterations omitted) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2))) (alterations omitted);[11] *see also*

---

[10]  "The regulations define 'treating source' as the claimant's 'own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant].' *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502).  A "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902.

[11]  On January 18, 2017, the Social Security Administration published a final rule that changed the protocol for evaluating medical opinion evidence.  *See* Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416).  The "new regulations apply only to claims filed on or after March 27, 2017." *Smith v. Comm'r*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018).  Because Plaintiff's claim was filed prior to that date, the Court refers to versions of the regulations that were in effect prior to March 27, 2017. *See White v. Comm'r*, No. 17-CV-4524, 2018 WL

*Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x

401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because

the continuity of treatment he provides and the doctor/patient relationship he develops place[s]

him in a unique position to make a complete and accurate diagnosis of his patient." (quoting

*Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

"Second, if the ALJ decides the opinion is not entitled to controlling weight, it must

determine how much weight, if any, to give it." *Estrella*, 925 F.3d at 95. In deciding how much

weight to assign to the opinion, the ALJ "must 'explicitly consider' the following, nonexclusive

'*Burgess* factors': '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of

medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining

medical evidence; and (4) whether the physician is a specialist.'" *Id.* at 95–96 (quoting *Selian*,

708 F.3d at 418); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)

(citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). "At both steps, the ALJ must 'give

good reasons . . . for the weight [it gives the] treating source's [medical] opinion.'" *Estrella*, 925

F.3d at 96 (quoting *Halloran*, 362 F.3d at 32). "An ALJ's failure to 'explicitly' apply the

*Burgess* factors when assigning weight at step two is a procedural error." *Id.* (quoting *Selian*,

708 F.3d at 419–20). "If 'the Commissioner has not [otherwise] provided 'good reasons' [for its

weight assignment],'" the district court is unable to conclude that the procedural error is

harmless, and remand is therefore appropriate, so that the ALJ can "comprehensively set forth

[its] reasons." *Id.* (alterations in original) (quoting *Halloran*, 362 F.3d at 33); *see also Sanders v.*

---

4783974, at \*4 (E.D.N.Y. Sept. 30, 2018) ("While the Act was amended effective March 27,
2017, the [c]ourt reviews the ALJ's decision under the earlier regulations because the
[p]laintiff's application was filed before the new regulations went into effect." (citation
omitted)).

*Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (noting that failure "to provide good

reasons for not crediting the opinion of a claimant's treating physician is a ground for remand");

*Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not

provided 'good reasons' for the weight given to a treating physician['s opinion . . . ."").

However, if a "searching review of the record" assures the court that the "substance of the

treating physician rule was not traversed," the court will affirm.  *Estrella*, 925 F.3d at 96

(quoting *Halloran*, 362 F.3d at 32).

ALJ Grunberg found that Plaintiff's "treatment provider['s]" opinion on Plaintiff's

functional capacity was not entitled to controlling weight.  (R. 209.)  In assigning it partial

weight, she determined that Chu's opinion was not entirely supported by the record.  (R. 209.)

The ALJ stated specifically that:

> Partial weight is given to the statements of [Plaintiff's] treatment
> provider, who reported that [Plaintiff] was seriously limited in
> maintaining attention for two-hour segments, performing at a
> consistent pace without an unreasonable number and length of rest
> periods, dealing with normal work stress, understanding and
> remembering detailed instructions, and dealing with stress of
> semiskilled and skilled work. . . . Although these statements were
> based on a treating relationship, they are only given partial weight
> because they are not fully supported by the record.  This opinion was
> provided in February [of] 2016; however, as discussed above, the
> record shows few ongoing psychiatric complaints and limited
> mental health treatment since 2013.

(R. 209.)  ALJ Grunberg cited the mental health treatment records from Cobb in support of her

conclusion.  (R. 209); *see also supra* Section I.c.xiii (detailing Chu's report).

As ALJ Grunberg acknowledges, Chu is a treatment provider.  (R. 209.)  However, there

is no indication in the record that Chu is a physician, and his evaluation report does not indicate

his employment, his title, or his medical qualifications, (R. 1889), although the Medical Source

Statement indicates that he has some relationship to Zucker Hillside Hospital.[12] (R. 5(a).)[13] Given the lack of information regarding his qualifications, the ALJ was obligated to develop the record to determine whether Chu was a physician who is entitled to deference based on the treating physician rule. *See Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) ("[W]hile the ALJ is certainly free to consider the opinions of [non-acceptable medical sources] in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." (citing *Mongeur*, 722 F.2d at 1039 n.2)); *Salisbury v. Comm'r of Soc. Sec.*, No. 19-CV-1198, 2020 WL 6384233, at *9 (W.D.N.Y. Oct. 30, 2020) (noting that the treating physician rule did not apply to the plaintiff's treating nurse's opinions); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9 (E.D.N.Y. Mar. 22, 2013) ("[T]he ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to give the treating physician's opinion." (citing *Burgess*, 537 F.3d at 129)); *Saxon v. Astrue*, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011) ("[T]he ALJ is empowered with the discretion to afford less than controlling weight, or even no weight, to the opinion of 'other sources,' [as long as she] address[es] and discuss[es] the opinion."); *see also* 20 C.F.R. §§ 404.1513(a), 416.913(a) (stating that non-physician medical professionals like nurse practitioners and counselors are "other" medical sources to be distinguished from "acceptable" medical sources like physicians).

---

[12] Because the Administrative Record's table of contents is not consecutively paginated, the Court refers to the page numbers assigned by the electronic case filing system for the index *only* with the added letter "a."

[13] Chu completed a Medical Source Statement that was listed on the Administrative Record's table of contents as coming from "Zucker Hillside Hospital." (R. 5(a).) A letter from Zucker Hillside Hospital corroborates the fact that Chu is connected with the facility, as the letter states that Plaintiff has been seen as an outpatient in their clinic starting on October 30, 2015, (R. 11), the same date that Chu lists as the start of his treatment sessions with Plaintiff, (R. 1884).

Because ALJ Grunberg did not determine whether Chu was a treating physician, the Court lacks sufficient information to determine whether ALJ Grunberg's decision to assign partial weight to his opinion is erroneous.  *Estrella*, 925 F.3d at 95 (noting that an ALJ "must follow" specific procedures "in determining the appropriate weight to assign a treating physician's opinion").  Accordingly, the Court remands the case to develop the administrative record and ascertain whether the appropriate weight was given to Chu's opinion.

### c.   ALJ Grunberg failed to adequately develop the record as to Plaintiff's mental limitations

The Commissioner argues that while "there were many inconsistences in the record," (Comm'r Mem. 35), the "massive record in this case ([over three thousand] pages) shows . . . that Plaintiff's drug-seeking behavior throughout the relevant period — not her physical or mental impairments — prompted her to go to countless hospital emergency departments," (*id.* at 31).

A district court must ensure that the ALJ has adequately developed the record in accordance with 20 C.F.R. § 404.1520(3), which requires an ALJ to consider all evidence in the case record when making a determination or decision on a claimant's disability.  *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) ("[I]t is the rule in our circuit that the [social security] ALJ, unlike a judge in a trial, must [on behalf of all claimants] . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." (alterations in original) (quoting *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999))).  Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, . . . '[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'"  *Burgess*, 537 F.3d at 128 (alteration in original) (first citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.

2002); and then quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 n.1 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).  This duty is present "[e]ven when a claimant is represented by counsel."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (collecting cases); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel . . . ."); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete." (first citing *Tejada*, 167 F.3d at 774; and then citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))).  In addition, the ALJ must attempt to fill gaps in the record.  *See Rosa*, 168 F.3d at 79 & n.5 (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996))); *Doria v. Colvin*, No. 14-CV-7476, 2015 WL 5567047, at *7 (S.D.N.Y. Sept. 22, 2015) ("The ALJ's duty to develop the record includes a duty to resolve apparent ambiguities relevant to the ALJ's disability determination.").

The duty to develop "includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the claimant's RFC."  *Sigmen v. Colvin*, No. 13-CV-268, 2015 WL 251768, at *11 (E.D.N.Y. Jan. 20, 2015) (citing *Casino-Ortiz v. Astrue*, No. 06-CV-155, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007), *report and recommendation adopted*, 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008)).  Pursuant to the SSA regulations, the

Commissioner is obligated to "make every reasonable effort to help [the claimant] get medical evidence from [her] own medical sources and entities that maintain [her] medical sources' evidence when [the claimant] give[s] . . . permission to request the reports." 20 C.F.R. § 404.1512(b)(1); *see also Perez*, 77 F.3d at 47. The Commissioner's duty to make such efforts includes the duty to seek, as part of such medical evidence and reports, a medical source statement or functional assessment detailing the claimant's limitations. *See Robins v. Astrue*, No. 10-CV-3281, 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011) ("Social Security Ruling 96–5p confirms that the Commissioner interprets those regulations to mean that '[a]djudicators are generally required to request that acceptable medical sources provide these statements with their medical reports.'" (alteration in original) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996))). Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996))); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) ("Failure to develop the record warrants remand."); *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." (citing *Moran*, 569 F.3d at 114–15)), *report and recommendation adopted*, 2012 WL 3069570 (S.D.N.Y. July 26, 2012). Nevertheless, even when an ALJ fails to develop the opinions of a treating physician, remand may not be required "where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi*, 521 F. App'x at 34.

Based on the reports of consultative examiners, ALJ Grunberg stated that "treatment

records reflect that [Plaintiff's] psychiatric symptoms are effectively treated with medication.  In addition, [ALJ Grunberg noted that] despite receiving limited treatment for her psychiatric impairments and ongoing issues with drug abuse, [Plaintiff's] symptoms have remained generally stable."  (R. 203–06.)

The ALJ failed to develop the record as to Plaintiff's mental limitations.  First, Plaintiff's history of drug abuse, which includes overdose incidents, pseudo-ER visits when she sought pain medication, and self-reports of drug use, (R. 295, 1282–1304, 2817, 2980), does not preclude a finding that she is mentally unstable.  *See Frederick v. Barnhart*, 317 F. Supp. 2d 286, 299 (W.D.N.Y. 2004) (finding that the plaintiff was entitled to benefits where "[t]he ALJ's conclusions conflict[ed] with the medical records from [the] plaintiff's treating sources that indicate[d] that [the] plaintiff's primary diagnoses are serious mental illnesses with a secondary issue concerning alcohol abuse").

Second, the fact that Plaintiff is deemed stable at a particular point in time does not preclude a finding of disability.  *See, e.g.*, *Barg v. Astrue*, No. 08-CV-1173, 2012 WL 11406531, at *10 (N.D.N.Y. Mar. 21, 2012) ("[A] doctor's notation that a condition is 'stable' during treatment does not necessarily support the conclusion that the patient is able to work." (alteration in original) (quoting *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008)).  On November 7, 2014, Plaintiff attended another treatment session and was found to be "stable on [a] present regimen of medications," to have no current suicidal ideations, and to have "[n]o current symptoms," but it was noted that when her symptoms are present, Plaintiff "cr[ies], [is] antsy, [is] hyper, [and has] severe mood swings, poor sleep, poor appetite, fatigue, [and] nausea from anxiety."  (R. 1593.)  This suggests that Plaintiff may struggle with her mental health on some days but not others.  *See Amarante v. Comm'r of Soc. Sec.*, No. 16-CV-717, 2017 WL

38

4326014, at *9 (S.D.N.Y. Sept. 8, 2017) ("A mental health patient may have good days and bad days; [she] may respond to different stressors that are not always active." (quoting *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015)) (citing *Richardson v. Astrue*, 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009))); *see also Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) (finding that the treating physician rule "is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time").

Third, ALJ Grunberg gave partial weight to the report of Plaintiff's "treatment provider" Chu who reported that Plaintiff had several serious limitations without supplementing the record. (R. 209.)  ALJ Grunberg acknowledged that Chu's "statements were based on a treating relationship" but gave them only "partial weight because they [we]re not fully supported by the record."  (R. 209.)  Because the lack of treatment notes appears to have influenced the ALJ's decision to discount Chu's opinion, the ALJ was required to "make at least one additional follow-up request to fulfill [h]er duty to develop the record."  *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 218 (S.D.N.Y. 2017) (finding that the ALJ failed to develop the record where the records were "critical" to the ALJ's decision to discount the opinion of a treating source); *see also Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Burgess*, 537 F.3d at 128)); *Hinds v. Barnhart*, No. 03-CV-6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18, 2005) ("The requirement that an ALJ clarify a treating source's opinion that a claimant is unable to work is part of the ALJ's affirmative obligation to develop a claimant's medical history.").

Fourth, ALJ Grunberg noted that Chu's "opinion was provided in February [of] 2016" but also noted that "the record shows few ongoing psychiatric complaints and limited mental

health treatment since 2013." (R. 209.) Although the form completed by Chu requested that

Chu "[a]ttach relevant treatment notes and test results as appropriate," no test results or treatment

notes were attached. (R. 1884–89); *see also Torres v. Saul*, No. 19-CV-1160, 2020 WL

6144658, at *8 (D. Conn. Oct. 20, 2020) ("The submission of [the treating physician's] opinion

by checklist form does not relieve the ALJ of her affirmative duty to develop the record."). The

lapse in time and statements by Chu, both noted and dismissed by ALJ Grunberg, as well as the

missing treatment notes and test results, indicate clear gaps in the record. *See Rosa*, 168 F.3d at

79 & n.5 (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where

there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical

history,'" the ALJ is under no obligation to seek additional information (quoting *Perez*, 77 F.3d

at 48)); *see also* 20 C.F.R. § 416.912(d)(2) (requiring the ALJ to develop claimant's complete

medical history). Similarly, although Plaintiff testified to receiving treatment for psychological

issues at LIJ for three years, she did not mention a specific provider, (R. 285–86), and ALJ

Grunberg failed to determine the provider. The ALJ had a duty to request records to close these

gaps. *See Elliott v. Colvin*, No. 13-CV-2673, 2014 WL 4793452, at *17 n.31 (E.D.N.Y. Sept.

24, 2014) ("[T]he ALJ's duty to develop the record was heightened in light of [the] [p]laintiff's

alleged psychiatric impairment." (citing cases)).

  Finally, the ALJ relied on consultative examiners rather than developing the record to

fully understand Plaintiff's longitudinal mental impairments. In reaching her conclusion that

Plaintiff had the RFC to perform light work, (R. 203), the ALJ relied upon (1) the "opinion of

Dr. Teli, who opined that [Plaintiff] had moderate restrictions [in] squatting and bending as well

as [a] mild restriction in using her right hand and arm," (2) the opinions of Dr. Berger and Dr.

Goldman because they were based on "detailed examinations," and (3) the assessment of Dr.

Blackwell, "who opined that[] despite her mental impairments, [Plaintiff] could perform simple work activity," as these opinions and assessments were "generally consistent with the record as a whole." (R. 209.)  These were consultative examiners who did not see Plaintiff over a period of time and only have snapshots, rather than holistic frameworks, of her mental functioning. *See Mateo v. Colvin*, No. 14-CV-6109, 2016 WL 1255724, at *15 (E.D.N.Y. Mar. 28, 2016) (finding error where ALJ gave "considerable weight" to a consultative examiner and relied on the consultative examiner's opinion as "objective medical evidence" to discredit the plaintiff's treating psychiatrist's opinion and ignored evidence corroborating the treating psychiatrist's opinion); *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704, 2015 WL 321832, at *28 (S.D.N.Y. Jan. 23, 2015) ("In the case of mental disabilities, '[t]he results of a single examination may not adequately describe [the claimant's] sustained ability to function.  It is, therefore, vital [to] review all pertinent information relative to [the claimant's] condition, especially at times of increased stress.'" (first, second, and fourth alterations in original) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E))); *Santiago*, 441 F. Supp. 2d at 629 (finding that the treating physician rule "is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time").

Although ALJ Grunberg was in possession of records from Plaintiff's 2010 to 2014 mental health outpatient treatment records from Cobb, (R. 1590–1745), Chu's 2016 evaluation that covered his mental health treatment sessions with Plaintiff beginning in October of 2015, (R. 1884–89), and numerous mental status exams from ER visits spanning from 2010 to 2017, (R. 196–212), the evidence available to ALJ Grunberg was an incomplete medical record as it relates to Plaintiff's longitudinal mental health records.  Other than the five-page document from Plaintiff's "treatment provider" Chu, (R. 1884–89), and a sole letter from Zucker Hillside

Hospital where she received mental health therapy, medical management sessions, and hospitalizations severally, the record does not provide much insight into Plaintiff's ongoing mental healthcare, (R. 11).

Accordingly, the Court finds that "remand is appropriate in view of the ALJ's failure to adequately develop the record by failing to make an additional effort in securing" documents that relate to Plaintiff's mental health records. *Valentine v. Comm'r of Soc. Sec.*, No. 18-CV-3985, 2019 WL 3974576, at *15 (E.D.N.Y. Aug. 21, 2019); *see also Katz v. Comm'r of Soc. Sec.*, No. 19-CV-2762, 2020 WL 5820146, at *5 n.11 (E.D.N.Y. Sept. 30, 2020) ("Though the treating physician rule does not apply to non-physician records, the [c]ourt notes that an ALJ can solicit information from a treating therapist as well as a treating physician where the medical evidence is contradictory or insufficient."); *Corrigan v. Comm'r of Soc. Sec. Admin.*, No. 18-CV-5686, 2019 WL 5212850, at *3 n.5 (E.D.N.Y. Oct. 16, 2019) (directing the ALJ to solicit information from the plaintiff's therapist on remand); *Jakubowski v. Berryhill*, No. 15-CV-6530, 2017 WL 1082410, at *16 (E.D.N.Y. Mar. 22, 2017) ("To the extent that the ALJ's conclusions rested on the absence of 'objective' mental status examinations or consistent case file notes from a psychiatrist, the ALJ was required to develop the record and to obtain information relevant to a disability determination." (internal citation omitted) (first citing *Burgess*, 537 F.3d at 128; and then citing *Tankisi*, 521 F. App'x at 33)); *Khan v. Comm'r of Soc. Sec.*, No. 14-CV-4260, 2015 WL 5774828, at *15 (E.D.N.Y. Sept. 30, 2015) (finding that the ALJ "ignored his affirmative duty to develop the record" by rejecting the opinions of treating sources "for lack of documentary support").

**d.  The Court cannot further assess whether the ALJ's decision is supported by substantial evidence**

The Commissioner argues that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and should be affirmed.  (Comm'r Mem. 31–32.)  In support, the Commissioner argues that ALJ Grunberg made an appropriate RFC determination and that the evidence Plaintiff submitted to the Appeals Council does not require remand.  (*Id.* at 36–44.)

The Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence in the record, whether the ALJ properly assessed Plaintiff's subjective report, or whether the additional evidence submitted to the Appeals Council was new and material because the ALJ failed to develop the record.  *See Baez v. Comm'r of Soc. Sec.*, No. 17-CV-3595, 2018 WL 4688951, at *9 (E.D.N.Y. Sept. 28, 2018) ("As the [c]ourt has previously noted, where 'an ALJ fails to adequately develop the record in reaching a conclusion as to a claimant's residual functional capacity, the [c]ourt is unable to review whether the ALJ's denial of benefits was based on substantial evidence.'" (quoting *Rivera v. Comm'r of Soc. Sec.*, No. 15-CV-837, 2016 WL 614688, at *15 (E.D.N.Y. Feb. 16, 2016)); *Corona v. Berryhill*, No. 15-CV-7117, 2017 WL 1133341, at *18 (E.D.N.Y. Mar. 24, 2017) (declining to address arguments as to whether the ALJ properly assessed the plaintiff's credibility when remanding for failure to develop the record); *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *4 (E.D.N.Y. Mar. 31, 2011) (noting that when the ALJ fails to develop the record, "'the [c]ourt need not — indeed, cannot — reach the question of whether the [ALJ's] denial of benefits was based on substantial evidence.'") (alteration in original) (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999))); *Ayer v. Astrue*, No. 11-CV-83, 2012 WL 381784, at *7 (D. Vt. Feb. 6, 2012) (declining to address arguments as to whether the plaintiff was disabled because the ALJ failed to adequately develop the record).

Accordingly, the Court declines to address the parties' remaining arguments without the benefit of an adequately developed record.[14]  *See Butts*, 388 F.3d at 385 ("That is, when 'further findings would so plainly help to assure the proper disposition of [the] claim, we believe that remand is particularly appropriate.'" (alteration in original) (quoting *Rosa*, 168 F.3d at 83)); *Martinez v. Saul*, No. 19-CV-1017, 2020 WL 6440950, at *13 (D. Conn. Nov. 3, 2020) (declining to reach the plaintiff's remaining arguments because the district court remanded for further development of the record).

## III.  Conclusion

For the foregoing reasons, the Court denies the Commissioner's motion for judgment on the pleadings and remands the case for further administrative proceedings consistent with this Memorandum and Order.  The Clerk of Court is respectfully requested to enter judgment and close this case.

Dated: December 9, 2020
      Brooklyn, New York

                          SO ORDERED:


                         ____s/ MKB_____
                         MARGO K. BRODIE
                         United States District Judge

---

[14]  The Court declines to address Plaintiff's remaining arguments because the ALJ will conduct a complete review of the matter on remand.  *See Pacheco v. Saul*, No. 19-CV-987, 2020 WL 113702, at *8 (D. Conn. Jan. 10, 2020) (holding that, on remand, the Commissioner must address the other claims of error not discussed in the ruling); *Faussett v. Saul*, No. 18-CV-738, 2020 WL 57537, at *5 (D. Conn. Jan. 6, 2020) ("[U]pon remand and after a *de novo* hearing, [the ALJ] shall review this matter in its entirety." (second alteration in original) (quoting *Delgado v. Berryhill*, No. 17-CV-54, 2018 WL 1316198, at *19 (D. Conn. Mar. 14, 2018))); *Moreau v. Berryhill*, No. 17-CV-396, 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018) ("Because the court finds that the ALJ failed to develop the record, it also suggests that the ALJ revisit the other issues on remand, without finding it necessary to reach whether such arguments would themselves constitute legal error justifying remand on their own.").